AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original

CLERK'S OFFICE
A TRUE COPY
Jun 04, 2025
s/ K. Reed
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched <br> or identify the person by name and address)* <br> Records and information including location information associated with the cellular device assigned call number 414-340-9162 ( "Target Cell Phone" ), that is in the custody or control of Verizon Wireless, further described in Attachment A | ) ) ) ) ) ) ) ) |

Case No. 25 MJ 70

Matter No 2025R00094

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 06/18/2025 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. William E. Duffin .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for 30 days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: 06/04/2025 at 10:15 a.m.

*William E. Duffin*
*Judge's signature*

City and state: Milwaukee, Wisconsin Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

1. Records and information associated with the cellular device assigned **call number 414-340-9162**, with International Mobile Equipment Identity number 352938142179626 (referred to herein and in Attachment B as "the Target Cell Phone"), with listed subscriber(s) "No Name" that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2. The Target Cell Phone

53

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

- a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period **May 1, 2025 to the present**:

    i. Names (including subscriber names, user names, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long distance telephone connection records;

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii. Means and source of payment for such service (including any credit card or bank account number) and billing records**[. OR**; and**]**

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

Honorable Nancy Joseph, United States Magistrate Judge, has also issued an order pursuant to 18 U.S.C. § 3123, dated May 30, 2025, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively

3

and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.      Information to be Seized by the Government

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Christopher Badgett, Jaime Rosado, the unknown user of the Target Cell Phone, and other persons known and unknown during the period of **May 1, 2025 to the present**:

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jun 04, 2025
s/ K. Reed
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.   25   MJ   70 |
| Records and information including location information associated with the cellular device assigned call number 414-340-9162 ( "Target Cell Phone "), that is in the custody or control of Verizon Wireless, further described in Attachment A | ) ) ) ) | Matter No 2025R00094 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

❐ property designed for use, intended for use, or used in committing a crime;

❐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b) & 846 | Possession with intent to distribute/distribution of controlled substances, use of a communication facility in furtherance of drug trafficking, and conspiracy to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Mark A Haleen*
_____
*Applicant's signature*

Mark Haleen, FBI TFO
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: ____06/04/2025____

*William E. Duffin*
_____
*Judge's signature*

City and state:   Milwaukee, Wisconsin     Honorable William E. Duffin, U.S. Magistrate Judge
_____
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Mark Haleen, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of:

    a.   the cellular telephones assigned call number **414-340-9162** with International Mobile Equipment Identity number 352938142179626 (the "**Target Cell Phone**"), whose service provider is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921;

    b.   the cellular telephone assigned call number **414-340-9162** (**Target Cell Phone**), whose service provider is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921, has a listed subscriber of "No Name" and is used by an unknown male (UM9162); and

    c.   the Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone**.

1

3. I am a sworn law enforcement officer with the Village of Mount Pleasant and a sworn Task Force Officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses including violations of Titles 18 and 21 of the United States Code.

4. I have been employed as a Law Enforcement Officer with the Village of Mount Pleasant (Wisconsin) since September 2010 and a sworn Federal Task Force Officer with the FBI since January 2020. I have obtained a Bachelor of Science Degree in Sociology from Central Michigan University. I have been involved in the enforcement and investigation of numerous violations of federal and state law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law.

5. As part of my duties, I investigate criminal violations relating to narcotics trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

    a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies.

    b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments);

    c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

    d. I have also relied upon informants to obtain controlled substances from dealers.

2

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

6. As part of my duties, I also investigate criminal violations relating to unlawfully possessed firearms, firearms trafficking, and possession of machineguns including criminal violations of Federal firearms laws, including, but not limited to Title 18, United States Code, Sections 922, 933, and 924. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in several investigations into illegal firearms and machinegun possession and firearms trafficking.

3

b. I am familiar with the language utilized over the telephone to discuss illegal firearms and machinegun conversion devices and know that the language is often limited, guarded, and coded.

c. I have utilized informants to investigate the sale and possession of illegal firearms, and I have also relied upon informants to obtain illegal firearms from dealers.

d. I know that people engaged in the illegal possession or distribution of firearms often use electronic equipment and cellular telephones to conduct firearm trafficking operations.

e. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

f. I have interviewed or participated in interviews of witnesses, confidential human sources (CHS), and sources of information (SOI) relative to the illegal possession and distribution of firearms.

7. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of

4

devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

9. As such, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

10. The facts in this affidavit come from my personal observations, my training and experience, court ordered/subpoenaed records, Title III interceptions, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, §§ 841(a), 843(b), and 846 have been committed, are being committed, and/or will be committed by Quentin Apkarian, Joey Miramontes, Trayveon Roy, Joshua Ramos, Jaime Rosado, Christopher Badgett, and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

12. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

<u>**PROBABLE CAUSE**</u>

13. The United States, including Federal Bureau of Investigation is conducting a criminal investigation of Quentin Apkarian, Joey Miramontes, Trayveon Roy, Joshua Ramos, Jaime Rosado, Christopher Badgett, and others, known and unknown, regarding possible violations including

5

violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 (Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance). As detailed below, members of the Apkarian Drug Trafficking Organization ("Apkarian DTO") are actively selling controlled substances in southeastern Wisconsin.

14. Special Agents of the Federal Bureau of Investigations and local officers have received information concerning the illegal drug trafficking activities of members of the Apkarian DTO from a confidential human source ("CHS#1"):

a. CHS#1 has been reporting to the Federal Bureau of Investigations since approximately September of 2024. CHS#1 is cooperating in exchange for monetary consideration. To date, CHS#1 has received $26,053.72 in monetary compensation for his/her cooperation with the FBI. Certain information provided by CHS#1 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, multiple controlled narcotics purchases, and a review of information contained within law enforcement databases. CHS#1 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CHS#1 has prior felony convictions for Burglary and Bail Jumping. CHS #1 has a pending criminal traffic charge for operating a vehicle after revocation. CHS#1 is cooperating with other law enforcement officers in hopes of receiving consideration on that open criminal traffic matter. I have discussed CHS#1 cooperation with the other law enforcement officer and CHS#1 has provided reliable cooperation to that agency. CHS #1 has no criminal convictions in the past five years. At no time during CHS#1's cooperation with the FBI have I found CHS#1 to have provided false information or engage in untruthful or deceptive behavior. As further detailed below, during controlled narcotics purchases, CHS#1 surreptitiously recorded the narcotics transactions at my direction. Case

2

agents later debriefed CHS#1 concerning what occurred during each transaction and then compared CHS#1's version of events with the recordings and case agent observations. Each time, CHS#1's information was corroborated by these independent sources. The basis of CHS#1's information detailed below is CHS#1's own personal observations and participation on the controlled narcotics purchases. Within the context of the information detailed and relied upon for purposes of this application, I believe that CHS#1 is credible and that CHS#1's information is reliable.

## PROBABLE CAUSE

15. Starting in October 2024, CHS#1 began conducting buys from Apkarian DTO members on behalf of law enforcement. To date, CHS#1 has conducted at least 27 buys from Apkarian DTO members for methamphetamine, marijuana, cocaine, fentanyl, and/or firearms.

16. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant (such as CHS#1) purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. If applicable, all of the calls to the target by the informant are consensually recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informant dial the target's number on each occasion and the

3

contact is verified through telephone records. When communication between the informant is done via electronic means (such as use of Facebook Messenger), case agents review the electronic communications, verify the user/profile names involved, and maintain a copy of the communications as part of the case file. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures. Further, unless otherwise noted, all drug results are based on presumptive field testing and field weights without packaging.

17.     As detailed below, case agents have been conducting court-authorized wire interceptions of communications associated with three DTO lines since mid-May 2025. During the interception period coupled with controlled buys with CHS #1, case agents discovered the user of cellular phone number 414-340-9162 (**Target Cell Phone**) is a likely crystal methamphetamine source of supply to the DTO.

18.     Case agents do not know the identity of the user of (414) 340-9162 (**Target Cell Phone).**

### TIII Authorization

19.     On May 13, 2025, the Honorable Lynn Adelman, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from (414) 550-7820 (TARGET TELEPHONE 1), used by Quentin Apkarian, to and from (414) 550-8124 (TARGET TELEPHONE 2), used by Joey Miramontes, and (414) 801-2099 (TARGET TELEPHONE 3), and used by Christopher Badgett (herein the TARGET TELEPHONES). The affidavit in support of wire interceptions over TARGET TELEPHONES 1, 2, and 3 is hereby incorporated into this Affidavit. Interceptions over the TARGET TELEPHONES commenced on May 15, 2025, and are scheduled to terminate at 11:59 p.m. on June 13, 2025.

### Controlled Buy—May 23, 2025

4

20.     I believe that Miramontes is the user of TARGET TELEPHONE 2 during the below calls on May 23, 2025, May 24, 2025, and May 29, 2025 as I have reviewed dozens of recorded calls and controlled buy recordings, and I can recognize his voice.  I believe that the user of 414-242-9011 is the same user of the **Target Cell Phone** as outlined in the below interceptions. Specifically, the IMEI for 414-242-9011 is the same IMEI for the **Target Cell Phone**, meaning that the same physical device was used for both telephone numbers.  Case agents determined that 414-242-9011 is no longer an active telephone number and appears to have been replaced by the **Target Cell Phone** (414-340-9162).

21.     On May 23, 2025, at the direction of case agents, CHS #1 contacted Miramontes to arrange a purchase of crystal methamphetamine. At 11:32AM CHS #1 placed a call to TARGET TELEPHONE 2, however Miramontes did not answer.  CHS #1 then sent TARGET TELEPHONE 2 (Miramontes) text messages as detailed below.  I confirmed CHS #1 sent and received the below messages by reviewing CHS #1's cellular device.

**CHS #1:** "Hit me"  (11:32AM)

**CHS #1:** "Got a Move" (11:33AM)

**CHS #1:** "Need 3 hit me" (11:39AM)

**MIRAMONTES:** "Of the tina"  (11:40AM)

**CHS #1:** "Just hit me when u free- the glass" (11:41AM)

**CHS #1:** "You able to make it shake today?  I got a short windows w my guys cash" (11:58AM)

**MIRAMONTES:** "I'm trying now"  (11:59AM)

**CHS #1:** "Ok" (12:00PM)

**CHS #1:** "Is it the same ticket or?"  (12:00PM)

**MIRAMONTES:** "idek I'm trying to call em now I hope so" (12:01PM)

**CHS #1:** "Alright lmk then" (12:01PM

**CHS #1:** "If u gotta stay locked at a number lmk so I can try n wiggle some room for me" (12:09)

**CHS #1:** "Any word?" (1:17PM)

**CHS #1:** "Or u think most likely not shaking today?" (1:18PM)

22.   Based on my training and experience, I believe that in this call: CHS #1 is asking Miramontes for 3 ounces ("Need 3 hit me") of crystal methamphetamine ("Just hit me when u free- the glass"). Miramontes confirms that CHS #1 is asking for crystal methamphetamine ("of the tina"). CHS #1 asks if the price is the same as previous controlled buys ("Is the ticket the same or?") and Miramontes replies that he is unsure and still trying to reach the supplier ("idek I'm trying to call em now I hope so"). I am aware from my training and experience that "Tina" is a common term used to describe crystal methamphetamine.

23.   On May 23, 2025, at 12:32PM, at the direction of case agents, CHS #1 placed a consensually recorded call to Miramontes at TARGET TELEPHONE 2 for the purpose of obtaining three ounces of crystal methamphetamine. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Hello"

**CHS #1:** "Hello you busy today?"

**MIRAMONTES:** "Um no not at all but I'm waitin on my guy and shit...to hit me back."

**CHS #1:** "Aww he gonna hit you back"

**MIRAMONTES:** "Ya I'm trying to tho."

**CHS #1:** "Yeah, I was gonna say damn near if you need that same figure we did the first time, cuz this dude is smokin that shit

**CHS #1:** "So I told him I can't do nothin unless it's three or better, so.....I'm trying to keep him at that same number."

**MIRAMONTES:** "Alright well let me try and get a hold of dude and shit, I'm still trying."

**CHS #1:** "Yeah just let me know then bro alright, alright."

**MIRAMONTES:** "Alright"

**CHS #1:** "I got time till like 4 or something"

**MIRAMONTES:** "Alright for sure bet"

**CHS #1:** "I gotta pick my kids up around then. Alright later bro."

**MIRAMONTES:** "Alright, bet, love."

24. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes is still trying to obtain the methamphetamine ("Um no not at all but I'm waiting on my guy and shit...to hit me back.") and is currently waiting for the source of supply to contact Miramontes. CHS #1 tells Miramontes that CHS #1 is only interested in obtaining at least three ounces of crystal methamphetamine ("So I told him I can't do nothing unless it's three or better, so.....I'm trying to keep him at that same number.").

25. At 4:01PM, CHS #1 received an incoming call from TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred

with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGE TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "I'm on my way there and shit, I really couldn't do too much and shit cause I had my brother in the car and shit"

**CHS #1:** "Oh that's why you-that's why you-yayaya"

**MIRAMONTES:** "That's why I was like man I dont want him to feel some type of way neither you know what I'm sayin and shit."

**CHS #1:** "No I feel you-ya ya ya. Yeah I guess we-we keep that separate cuz I ain't really said none neither....so I mean."

**MIRAMONTES:** "Yeah then like really and shit I just like he I aint gonna lie and shit, the other day and shit, when we went and bust a move and shit for-for when we did that whatever."

**CHS #1:** "Yeah"

**MIRAMONTES:** "Fuckin he was like tryin off-he was like tryin to offer me money I was like nah just keep it-just keep it and shit."

**CHS #1:** "Yeah"

**MIRAMONTES:** "I'm like-I'm like-I'm like 6 minutes away now."

**CHS #1:** "6 minutes away?......You said 6 minutes away?"

**MIRAMONTES:** "Yeah"

**CHS #1:** "God damn...alright...I'm uh...give me like 15 to get there."

**MIRAMONTES:** "15?"

**CHS #1:** "Yeah about 15....If you haven't leave out yet then-then-then just give me like 10 minutes to leave out."

8

**MIRAMONTES:** "Alright, bet....bet bet bet. I'mma post- I'mma post up then just let me know, just be like-be like you can leave and I'll-I'll hop out."

**CHS #1:** "Alright bet bro."

**MIRAMONTES:** "Alright love bro."

**CHS #1:** "Alright love."

26. From reviewing pole camera surveillance and prior interceptions, I believe that Miramontes was with Apkarian and did not want Apkarian to be aware of this transaction so Miramontes could keep the profits for himself. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 why Miramontes was not speaking to CHS #1 on the phone earlier ("I'm on my way there and shit, I really couldn't do too much and shit cause I had my brother in the car and shit"). Miramontes further discusses how during the controlled buy for 9 ounces of cocaine on May 20, 2025 Apkarian wanted to give Miramontes some of the money however Miramontes declined ("Yeah then like really and shit I just like he I aint gonna lie and shit, the other day and shit, when we went and bust a move and shit for-for when we did that whatever.") and ("Fuckin he was like tryin off-he was like tryin to offer me money I was like nah just keep it-just keep it and shit.") Miramontes then tells CHS #1 that Miramontes is only 6 minutes away ("I'm like-I'm like-I'm like 6 minutes away now.")

27. At approximately 4:09PM, case agents met with CHS #1 at a predetermined location and TFO Baclawski searched CHS #1 and CHS #1's vehicle and no money, drugs, or weapons were found. TFO Baclawski provided CHS #1 with $1725 in prerecorded buy money, outfitted CHS #1 with recording devices, and followed CHS #1 to the meeting location, 10009 Northwestern Avenue, Franksville, Wisconsin. From the time that CHS #1 was searched by TFO Baclawski until the time that Miramontes entered CHS #1's vehicle, CHS #1 was kept under constant visual surveillance and did not make any stops or meet with anyone other than

9

Miramontes. At 4:15PM, pole camera surveillance observed Apkarian's Dodge Charger Hellcat ("the Hellcat") leave 2322 Kae Court, Mount Pleasant, Wisconsin (Apkarian's residence) and physical surveillance observed the Hellcat arrive at the buy location a few minutes later.

28. While on surveillance, TFO Klinkhammer observed Miramontes exit the Hellcat's driver seat and enter CHS #1's vehicle. According to CHS #1, Miramontes entered CHS #1's vehicle and provided CHS #1 with the crystal methamphetamine in exchange for the $1725. CHS #1 later met with TFO Baclawski and turned over two baggies containing the suspected crystal methamphetamine. CHS #1 and CHS #1's vehicle was again searched for weapons, money, and drugs and none were found. From the time that CHS #1 arrived at the buy location until CHS #1 met up with TFO Baclawski after the transaction, CHS #1 was kept under constant visual surveillance and did not make any stops or meet with anyone other than Miramontes.

29. Case agents reviewed the audio/video recording made by CHS #1 of the transaction and found it to be consistent with CHS #1's account of the transaction. The drug transaction and money exchange was clearly captured on the video, which showed Miramontes hand the crystal methamphetamine to CHS #1, who, in turn, provided Miramontes with the $1725 in buy money. Case agents later field tested and weighed the crystal methamphetamine and found the total weight to be 86.5 grams. A Nark II test kit revealed a presumptive positive reaction for the presence of methamphetamine. I reviewed the pole camera surveillance footage which showed the Hellcat return to 2322 Kae Court at approximately 4:30PM.

30. On May 24, 2025, at 8:33AM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes from 414-242-9011. I confirmed that this call occurred between TARGET TELEPHONE 2 and 414-242-9011 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. This call was

10

reviewed by case agents.   The beginning of the call was not[1] captured due to an unknown malfunction.  Below is a transcript of the relevant portion of that call:

UM9011: "You go give it to him, give him like a gram or two off the zap, uh, he said if it's good then everything everything everything. If it's not paper gon- paper good cuz it ain't no paper. Ya know what I'm sayin? A mother fucker get that paper back no if and s or buts about it. I'm all in the business bro it's long term, that's what I'm looking for. It's long term."

MIRAMONTES: "See that uh yeah that tina and shit yeah my people was fuckin with that shit too and shit. They-they-they more they more like that shit when it's like when it's like all uh yeah all chunk but that shit but that shit just presentation, that's all just pre sentation."

UM9011: "It's the perspective cuz."

MIRAMONTES: "Other than that bro, fuckin G he-he hit my line and shit and said that shit was fire and shit. I'm gonna be comin back and shit imma gonna be down there and come and grab another-another three of them from you and shit."

UM9011: "Yeah uh okay."

MIRAMONTES: "What's that called, uh, what's that called? Just give me like - give me like ten minutes and I'm finna uh I'm finna hit you right back."

UM9011: "Alright fo-sho gang just give me a ring when you're ready buddy."

MIRAMONTES: "Yeah say less."

UM9011: "Alright love ya buddy."

MIRAMONTES: "Alright, love."

31.    Based on my training and experience, I believe that in this call: Miramontes and UM9011 are discussing the crystal methamphetamine that Miramontes obtained from UM9011 (

---

[1]  The user of 414-242-9011 has not been identified and is herein "UM9011". As further detailed, I believe that the user of 414-242-9011 is the same person currently using the **Target Cell Phone**.

11

"See that uh yeah that tina and shit yeah my people was fuckin with that shit too and shit. They-they-they more they more like that shit when it's like when it's like all uh yeah all chunk but that shit but that shit just presentation, that's all just presentation."). Miramontes tells UM9011 that Miramontes' drug customer contacted Miramontes ("… fuckin G he- hit my line…") and liked the quality of the crystal methamphetamine (…"and said that shit was fire…"). Miramontes tells UM9011 that he will likely purchase more crystal methamphetamine from UM9011 and specifically references obtaining another three ounces ("I'm gonna be comin back and shit imma gonna be down there and come and grab another-another three of them from you and shit."). In context, I believe that UM9011 supplied Miramontes the three ounces of crystal methamphetamine that Miramontes in turn sold to CHS #1 on May 23, 2025.

32. On May 24, 2025, at 1:10PM court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Miramontes (TARGET TELEPHONE 2) to 414-242-9011. I confirmed that this call occurred between TARGET TELEPHONE 2 and 414-242-9011 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. This call was reviewed by case agents. Below is a transcript of the relevant portion of that call:

**MIRAMONTES:** "Yo l-l-l-look, what's that called, you got some hard too right? How much you gonna charge for a little gram of that?

**UM9011:** "A gram?"

**MIRAMONTES:** "Not even-not even a gram just a little 50"

**UM9011:** "Just, that's-that's generally like - that's generally like a One-One, for a 50 I'll do like One- One ...*unintelligible*"

**MIRAMONTES:** "Damnnn, uh"

**UM9011:** "Whatchu want, why"

**MIRAMONTES:** "I'm uh, cuz I'm-I'm just trying to do a little like, little test little tiny thing and shit, little experiment type shit....I'm gonna come grab that from you and shit..and uh..I'm gonna grab a ball too and shit."

**UM9011:** "Alright, you is ready right now?"

**MIRAMONTES:** "Yeah I'm ready right now it's just that I'm in-I'm in South Milwaukee with my daughter and shit. But I can-I'm gonna head back towards that way and shit cuz I gotta move that way and shit. "

**UM9011:** "Alright, okay okay okay okay, cool, that's cool that's cool, that's working....you talking about North- Southside G?"

**MIRAMONTES:** "Uh Southside."

**UM9011:** "Southside, yup...alright just call me when you ready but I'm finna get up right now, bro I'm bullshit, I'm finna get up right now."

**MIRAMONTES:** "Yeah get-get up right now and shit and then, uh, what's that called, in a little bit I'm finna be headin towards that gas station on 6th - 6th and Beecher, that little gas station. I'm gonna head towards over there and shit and then um what's that called, I'm gonna grab that from you and shit and if everything goes good with that I'm just come back and grab some more and shit.

**UM9011:** "Alright, alright, alright, um, alright that's cool gang"

**MIRAMONTES:** "Alright say less"

**UM9011:** "Alright uh yeah"

33.     Based on my training and experience, I believe that in this call: Miramontes is asking to obtain one gram of crack cocaine from the user of 414-242-9011 ("Yo l-l-l-look, what's that called, you got some hard too right? How much you gonna charge for a little gram of that?").

Based on my training and experience, I know that "hard" is a common term used to describe crack cocaine/cocaine base (whereas "soft" is commonly used to refer to powder cocaine).

34. On May 24, 2025, 1:51PM, a court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Miramontes (TARGET TELEPHONE 2) to 414-242-9011. I confirmed that this call occurred between TARGET TELEPHONE 2 and 414-242-9011 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. This call was reviewed by case agents. Below is a transcript of the relevant portion of that call:

**UM9011:** "You on 52nd and Hampton? That's perfect bro

**MIRAMONTES:** "Yeah I'm right here, I'm at the GYRO restaurant, the EXPRESS GYROS"

**UM9011:** "I'm comin down Silver Spring but I-I'll see you in a little bit then"

**MIRAMONTES:** "Alright say less....AY...AY...that-that-that-that white girl, that mutha fucka soft? I mean-I mean is it like-is it like it ain't no shake, right?"

**UM9011:** "no no no no no"

**MIRAMONTES:** "Alright we good-we good"

**UM9011:** "You finna see the full set up cuz"

**MIRAMONTES:** "Alright say less-say less I'm right here."

**UM9011:** "Alright"

35. Based on my training and experience, I believe that in this call: Miramontes is waiting for UM9011 to arrive at the meeting location ("Yeah I'm right here, I'm at the GYRO restaurant, the EXPRESS GYROS") and UM9011 is on the way to the location ("I'm comin down Silver Spring but I-I'll see you in a little bit then"). Miramontes then asks about the quality of the cocaine ("…-that white girl, that mutha fucka soft? I mean-I mean is it like-is it like it ain't no

14

shake, right?...") and UM9011 indicates it is not loose ("no, no, no, no") and ("You finna see the full set up cuz").

36. At 2:14PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes (TARGET TELEPHONE 2) from 414-242-9011. I confirmed that this call occurred between TARGET TELEPHONE 2 and 414-242-9011 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. This call was reviewed by case agents. In sum, during the call, Miramontes is directing UM9011 to Miramontes' location behind the Gyros Express near 52nd and Hampton in Milwaukee, Wisconsin.

**May 29, 2025 Controlled Buy**

37. On May 29, 2025, at 10:57AM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes) for the purpose of obtaining three ounces of crystal methamphetamine. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**CHS #1:** "Three zips of that Tina"

**MIRAMONTES**: "Yep. I got a call him right quick."

**CHS #1:** "alright, call him back and then let me know. You think it will be the same price that 16, what was it that $1650?"

**MIRAMONTES:** "Most likely and shit, with him and shit its more about like the more you grab the lesser he goes type shit. You know what I'm saying, it's kinda hard to grab a lot and shit when the price is [ui]. Let me call him first and shit"

**CHS #1:** "alright call him and let me know"

**MIRAMONTES:** "did you see that, them two drakes? Dude has them bitches on deck and shit."

**CHS #1:** "I probably won't have no money til tomorrow or the next day bro, to be honest with you for that."

**MIRAMONTES:** "If anything whats that called you want me to grab at least one of them and put if up for you?

**CHS #1:** "Let me confirm that with you."

**MIRAMONTES:** "It's up to you and shit cause I aint gonna lie that Mini Drake, that mini drake, thats probably going to be the highest commodity one just because you can maneuver with it, you can tuck it, you can do anything with that one and shit."

**CHS #1:** "Alright give me a second then, Im gonna call you right back. but see whats up with those right now."

38. Based on my training and experience, I believe that in this call: CHS #1 is requesting three ounces of crystal methamphetamine from Miramontes ("Three zips of that Tina"). Miramontes is telling CHS #1 that he will have to get a hold of his source of supply ("Yep. I got a call him right quick.") and a price has not been determined yet ("Most likely and shit, with him and shit its more about like the more you grab the lesser he goes type shit…")

39. On May 29, 2025, at 11:00AM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes) for the purpose of obtaining three ounces of crystal methamphetamine. This call was recorded through the court authorized

16

interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **MIRAMONTES:** "I'm trying to call dude right now and he ain't answering though but, hopefully he probably just asleep."
>
> **CHS #1:** "Yeah, alright well let me know soon then, Ill be ready Ill probably just grab the money from dude, cause it will probably go through either way huh?"
>
> **MIRAMONTES:** "yeah just grab the money from dude cause most likely it will go through."
>
> **CHS #1:** "alright bet, then um, I'm gonna have just just hold of on those ones right now cause I've been like stockpiling boy."
>
> **MIRAMONTES:** "alright let me give you a call back let me call this nigga and shit, cause he just called and shit"

40. Based on my training and experience, I believe that in this call: the conversation from the previous call between Miramontes and CHS #1 continued. Miramontes is telling CHS #1 that Miramontes is contacting the source of supply, but is not getting an answer ("I'm trying to call dude right now and he ain't answering though but, hopefully he probably just asleep.").

41. I reviewed the pen register/trap and trace records for TARGET TELEPHONE 2 and found that Miramontes made two outgoing calls to 414-242-9011 at 10:59AM that went unanswered and sent two outgoing text messages to 414-242-9011 at 10:59AM. I believe that Miramontes is attempting to contact his crystal methamphetamine source of supply (""I'm trying to call dude right now…") at 414-242-9011.

17

42.     On May 29, 2025, at 11:38AM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "I think he's asleep right now cuz his phones just like going to voicemail"

**CHS #1:** "Oh ok, well shit um, let me know then once you hear back."

**MIRAMONTES:** "Alright say less."

**CHS #1:** "I'll be waiting to hear from you."

**MIRAMONTES:** "Alright love bro."

**CHS #1:** "Bet (UI), and I got the cash too so let me, let me know."

**MIRAMONTES:** "You say what?"

**CHS #1:** "I said I got the cash too now so just let me know."

**MIRAMONTES:** "Alright for sure, bet."

**CHS #1:** "Alright bet."

**MIRAMONTES:** "Alright love."

43.     Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that the methamphetamine source of supply is not answering the phone and that the call is being directed to voicemail ("I think he's asleep right now cuz his phones just like going to voicemail"). CHS #1 then tells Miramontes that CHS #1 has the money for the crystal methamphetamine ("I said I got the cash too now so just let me know.")

18

44.    On May 29, 2025, at 1:48PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Miramontes (TARGET TELEPHONE 2) to the **Target Cell Phone**. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2).  This call was reviewed by case agents.  I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:2

**UM9162:** "You aint seen the text I [UI}"

**MIRAMONTES:** "I just seen that I just seen that. I know, I got like fuckin three JB's in my phone."

**UM9162**: "Oh so you probably dont know who the fuck that was."

**MIRAMONTES:** "Oh hey yeah Twin probably about to call you right now"

**UM9162**: "He did, he just called me. Thats why bro I'm just like what the fuck...man I'm just gonna call the dude directly."

**MIRAMONTES:** "Yeah, cause I didn't know that cause this nigga I know named JB, this nigga be, bro, this nigga, dealing withthis nigga and shit bro this nigga like dodges death every fucking five minutes and shit. Yeah dog, but wahts that called, the other day nigga I was trying to call you nigga yo mother fucking phone was'nt on and shit. You missed out, we coulda had that mother fucker for you bro. My nigga had I had even better for your ass Nigga, my Nigga had a fuckin .300 blackout that was fully nigga. Nigga I was blowing your shit up, I called you like 8 times 9 times and I even waited 4 hours and then I called you 8

---

2 Until the user of 414-340-9162 is identified he will be herein referred to as UM9162.

19

more times nigga. Then your phone just off, Im like bro I am looking on the Milwaukee recently booked page and .....locked up bro."

**UM9162**: "Damn bro"

**MIRAMONTES:** "Nigga, my nigga had a fully .300 blackout custom, the barrel was .300 blackout, and then the shell of it was like a whole nother gun. But you look at the barrel nigga barrel was .300 barrel nigga and that mother fucker was fully automatic nigga. I gotta a video blowin that bitch, I was blowin that mother fucker in the side of the house."

**UM9162:** "Get me one of those"

**MIRAMONTES:** "I gotta hit hi m back up, see if he still has got it on deck. You coulda got that bitch for the low, guess how much you woulda got that for."

**UM9162:** "Forward it to me bro, how much you thinkin"

**MIRAMONTES:** "How much you think you woulda got that for? And you can switch it from semi to fully nigga. I mean you coulda got that bitch for like $650 nigga."

**UM9162:** "How much?"

**MIRAMONTES:** "Like $650 nigga"

**UM9162:** "I woulda came for it bro"

**MIRAMONTES:** "And the only, the only thing nigga is it did not come with bullets, but you don't give no fuck about that, you know what I am saying. Nigga I was fittin to grab that mother fucker nigga, I was calling your phone to verify that you wanted that nigga."

**UM9162:** "On my momma I did bro."

**MIRAMONTES:** "I just cant have that shit sitting around. I gotta nigga right now thats sellin two drakes"

**UM9162:** "Is it little?"

20

**MIRAMONTES:** "He got one micro Draco, but he want, I aint gonna lie, he kinda taxin on the micro Draco...he want 15 for the micro Draco"

**UM9162:** "Hell no"

**MIRAMONTES:** "But the other one and shit, he want 13"

**UM9162:** "Thats cause its big, I dont want the big one, I want the little ones"

**MIRAMONTES:** "You got 4 of them on you?"

**UM9162:** "I could go get it"

**MIRAMONTES:** "You might as well go grab it right now and shit, I'm gonna come past you."

**UM9162:** "Alright I fixin to call"

**MIRAMONTES:** "Do you think you could do them for the $250"

**UM9162:** "Uh..."

**MIRAMONTES:** "I'll grab 4 of them right now and shit if you can do it for $250, if not I can only grab 3."

**UM9162:** "Ok, let me make this call let me make sure their ready to come get em"

**MIRAMONTES:** "How long you thinkin"

**UM9162:** "I don't know, let me call him real quick. I am sitting in the lounge right now trying to grab his food."

**MIRAMONTES:** "Alright, just call me back please"

**UM9162:** "Ok as soon as I hear anything I will call you right back."

**MIRAMONTES:** "Ok, love bro."

45. Based on my training and experience, I believe that in this call: Miramontes finally reached the crystal methamphetamine source of supply, who goes by "JB" ("I just seen that I just seen that. I know, I got like fuckin three JB's in my phone."). UM9162 asks if Miramontes saw

21

the text message ("You aint seen the text I [UI]"). I believe, in context, UM9162 provided Miramontes with UM9162's new phone number after abandoning 414-242-9011. Miramontes tells UM9162 that Miramontes has been trying to reach him and that UM9162's phone was going right to voicemail ("Nigga I was blowing your shit up, I called you like 8 times 9 times and I even waited 4 hours and then I called you 8 more times nigga. Then your phone just off, Im like bro I am looking on the Milwaukee recently booked page and [UI] locked up bro."). In context, in conjunction with the previous conversations with CHS #1, I believe that UM9162 is the same person Miramontes was speaking to CHS #1 about ("…Milwaukee recently booked page and [UI] locked up bro.") and that the user of 414-242-9011 has switched phone numbers and is now using 414-340-9162 (**Target Cell Phone**). Miramontes asks UM9162 if UM9162 has four ounces of crystal methamphetamine ("You got 4 of them on you?") and UM9162 replies that he could go get it ("I could go get it"). Miramontes confirms that he will purchase the four ounces ("You might as well go grab it right now and shit, I'm gonna come past you.") and UM9162 agrees to make a call ("Ok, let me make this call let me make sure their ready to come get em").

46. On May 29, 2025, at 1:55PM, CHS #1 received a connected voice call from TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**CHS #1:** "Damn (UI)"

22

**MIRAMONTES:** "I, I got, I got one more, I got one more dude I can go through and shit but I just don't know what the fuck this nigga's taxing and shit, that's the only thing."

**CHS #1:** "Right. Yeah I was gonna say if dude answered if it was , if four was more worth while then, get a little price drop then I'd do four, but I guess see what's up if you can."

**MIRAMONTES:** "I'm, I'm still trying to give him a try and shit, this nigga just not answering like at all, like, this nigga like, I call and this shit going to voicemail, like so I'm hoping, I've been looking on the Milwaukee page I'm just trying to see if the nigga locked up or not."

**MIRAMONTES:** "Hell yeah bro. Well shit let me, let me call this nigga bro and let me try to make something happen bro, to see (UI)"

**CHS #1:** "Yeah let, let me make, let, let me know and then like, like I said like, if you gotta do an extra one just to make it worth the, I know you gotta make some pape too so let me know."

**MIRAMONTES:** "Yeah"

**CHS #1:** "So I'll, uh, I'll, I'll, you know what I'm saying, I'll do the four but if you can get the three, let me know the ticket bro."

**MIRAMONTES:** "Alright say less."

**CHS #1:** "I got the, I got the, I got dude's bread but I'll, I'll damn near just buy another one for myself to hold onto it."

**MIRAMONTES:** "Yeah no bullshit cause you can, I ain't gonna lie you can (UI)"

**CHS #1:** "I might try to just get something going by myself if I get an extra one so"

**MIRAMONTES:** "But you, nigga, that nigga, whoever dude is that's grabbing them and shit"

**CHS #1:** "Yeah"

23

**MIRAMONTES:** "I don't think he, I don't, I don't, I don't think he's uh, I don't think he's uh, what's that called, smoking it bro."

**CHS #1:** (UI)

**MIRAMONTES:** "I think, I think he's uh, I think he's dumping it."

**CHS #1:** "Yeah (UI), but like, he be so tweaked out bro when he gives me the money so it's like (UI)"

**MIRAMONTES:** "Ok alright dude's calling, dude's calling me right now let me call you right back."

**CHS #1:** "Alright bet."

**MIRAMONTES:** "Alright."

47. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes is still having problems contacting the source of supply ("so, dude aint fucking answering this shit bro I don't know what the fuck he got going on and shit"). However, based on the previous call with 414-340-9162 (**Target Cell Phone**), I believe Miramontes is being untruthful with CHS #1 in order to allow Miramontes more time to complete the deal. At the end of the conversation, Miramontes tells CHS #1 that the source of supply is calling him right now ("Ok alright dude's calling, dude's calling me right now let me call you right back."). I reviewed the pen register/trap and trace records which show an incoming call from 414-340-9162 (**Target Cell Phone**) at 1:59PM.

48. On May 29, 2025, at 1:59PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes (TARGET TELEPHONE 2) from 414-340-9162 (**Target Cell Phone**). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the

24

court authorized pen register/trap and trace data for TARGET TELEPHONE 2. The beginning of the call was not captured due to unknown technical problems. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yeah yeah yeah, go ahead, go ahead, go ahead, go ahead"

**UM9162:** "Alright I'm gonna call you later."

**MIRAMONTES:** "Alright for sure say less"

49. I believe based on my training and experience that this call was a follow up conversation about the crystal methamphetamine purchase and that UM9162 would be in touch with Miramontes in the future to further discuss the drug transaction.

50. On May 29, 2025, at 2:16PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yo. It's, it's a go and shit bro I'm just waiting and shit cause he don't wanna talk numbers on the phone with me and shit so I gotta wait for the nigga (UI)"

**CHS #1:** "Alright bet. Alright well just let me know then what it's gonna be three or four, and then"

**MIRAMONTES:** "Alright say less. It's, it's, it's, it's gonna be four of them."

**CHS #1:** "Four?"

**MIRAMONTES:** "Yeah he said he gonna bring four of them."

25

**CHS #1:** "Alright, well try to get a better price if you can for me then, and then uh"

**MIRAMONTES:** "That's what, that's what I'm trying to do right now (UI), I'm fucking say shit to him cause he was like I don't want to talk numbers over the phone and shit, he was like I'll talk to you when I get there so"

**CHS #1:** "Alright"

**MIRAMONTES:** "He said he pulling up in a little bit and shit, we, we gotta try to make it happen today though because I gotta ship out to Chicago and be out there for a couple days."

**CHS #1:** "Alright well yeah, shit uh, let's try to make it quick then, uh, let me know as soon as you got it in hand and then give me the number and then I'll grab, cause I'm gonna have to stop at the ATM and get the rest of the money so let me know."

**MIRAMONTES:** "Alright say less."

**CHS #1:** "Alright (UI)"

**MIRAMONTES:** "Alright love bro."

**CHS #1:** "Love bro."

51.     Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that the deal is going to happen ("Yo. It's, it's a go and shit bro I'm just waiting and shit cause he don't wanna talk numbers on the phone with me and shit so I gotta wait for the nigga (UI)") and the source of supply is going to bring four ounces ("Yeah he said he gonna bring four of them.").

52.     At 2:21PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes (TARGET TELEPHONE 2) from the **Target Cell Phone**. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap

26

and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

MIRAMONTES: "Yo yeah I'm right here by Drew-by Drew Street.

UM9162: "I'm on the north side"

MIRAMONTES: "Where at, I can meet you halfway"

UM9162: "Ummm I'm finna be coming down to....alright hello...."

MIRAMONTES: "Yeah, hello."

UM9162: "Hey....*talks to people in the background*....mhmmm....that's cool, that's cool.......okay yeah that's fine, alright, alright, bye......*talking to MIRAMONTES* Ummm you trying to-can you meet me on like-like Capitol."

MIRAMONTES: "What umm it depends where at Capitol."

UM9162: "Like 11th. Right off the highway."

MIRAMONTES: "11th and Capitol?"

UM9162: "Yeah."

MIRAMONTES: "Yeah I got you."

UNKNOWN MALE IN CAR: "Tell him I'm bringing them things for him too."

MIRAMONTES: "Hey he said he's finna bring them things for you too."

UM9162: "On my life good lookin, I'm ready, I'm deep."

MIRAMONTES: "Alright for sure I got you, uh, whatchu call it I'm gonna start heading towards there right now."

UM9162: "Okay that's cool bro."

MIRAMONTES: "Hey, uh did you-Hey..."

UM9162: "Huh"

MIRAMONTES: "Did you uh-did you talk them numbers with him."

27

**UM9162:** "Oh I'm finna go bump into him like right as we speak. You just told me to hurry up fool I just got done eating bro."

**MIRAMONTES:** "I gotchu for sure."

**UM9162:** "Yeah yeah yeah."

**MIRAMONTES:** "Just-just make sure he knows that if he does them for the 250 I grab 4 of them but if he can't do them for 250 I only can grab 3."

**UM9162:** "I'mma tell him."

**MIRAMONTES:** "Alright fa sho say less."

**UM9162:** "Alright alright later."

53.     Based on my training and experience, I believe that in this call: Miramontes and UM9162 are setting up a meeting location ("11th and Capitol?") on the northside of Milwaukee to conduct the drug transaction.

54.     At 2:40PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes).  This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number.  This call was reviewed by case agents.  I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2.  Below is a transcription of the relevant portion of that call:

**CHS #1:** "What up?"

**MIRAMONTES:** "Yo, yeah I'm waiting, still waiting on dude and shit."

**CHS #1:** "Oh ok, I just seen I had a missed call from you I thought you figured it out."

**MIRAMONTES:** "Nah I'm just waiting on him and shit, I'm trying to figure it out I just need a number from this nigga."

**CHS #1:** "Yeah, and then what, how long will it take you, you wanna do Pilot again?"

**MIRAMONTES:** "Yeah we can do Pilot again."

**CHS #1:** "(UI) or IKEA was better."

**MIRAMONTES:** "IKEA was a little a little bit low (UI)"

**CHS #1:** "It was low yeah, just, it was a little bit farther, but whatever you wanna do."

**MIRAMONTES:** "Yeah just a little bit further. Shit if you want we can do the IKEA."

**CHS #1:** "If that's gonna make it happen faster then yeah (UI)"

**MIRAMONTES:** "That's gonna make it happen way faster and shit cause I don't mind shooting up to IKEA right away and shit, it's just that I gotta go to IKEA and then I gotta shoot back down here and then I gotta shoot exactly right back on the freeway to Chicago."

**CHS #1:** "Yeah so you rather be closer to you then anything anyway."

**MIRAMONTES:** "Yeah it's just (UI), I gotta get my sister's clothes together and shit"

**CHS #1:** "Yeah."

**MIRAMONTES:** "All types of shit, cause she, she can't, so motherfucker gotta shower her and shit you know what I'm saying, so motherfucker gotta"

**CHS #1:** "Yeah."

**MIRAMONTES:** "Get her shit together for her and shit."

**CHS #1:** "Alright well um, as soon as you get it then let me know when you're on the way and, and then, give me like 10 minutes to leave cause it's gonna take me like 25 to get there."

**MIRAMONTES:** "That's fine."

**CHS #1:** "Alright, let me know then."

**MIRAMONTES:** "Alright love bro."

55. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes still waiting for the supplier to obtain the crystal

29

methamphetamine ("Yo, yeah I'm waiting, still waiting on dude and shit."). CHS #1 and Miramontes agree to meet at the Ikea store to complete the drug transaction ("Yeah just a little bit further. Shit if you want we can do the IKEA.").

56. At 2:49PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes (TARGET TELEPHONE 2) from 414-340-9162 (**Target Cell Phone**). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**UM9162:** "How far is you gang."

**MIRAMONTES:** "Yo yo."

**UM9162:** "how far is you gang?"

**MIRAMONTES:** "My bad, my bad, my bad, hello."

**UM9162:** "You hear me?"

**MIRAMONTES:** "You hear."

**UM9162:** "Yeah yea yeah how long how long you gonna be till you make it here?"

**MIRAMONTES:** "Shit, not even and shit hold on."

**UM9162:** "Like seven."

**MIRAMONTES:** "The highway the highway is clogged up and shit. I aint gonna lie it said 18 minutes and shit cuz it's clogged up unless i jump off the freeway *unintelligible* yep I'm gonna hop off the freeway *unintelligible* I'm just on the freeway until I see where it gets red...."

**UM9162:** "Bizzle you can't come closer Bizzle?.....Uh you trying to meet me on 10th and Locust?"

**MIRAMONTES:** "Yeah I can do that."

**UM9162:** "Yeah it's a little closer then you know cuz the highway is on the Locust highway then you can get right off.”

**MIRAMONTES:** "Alright bet. Yeah yeah that seems better..."

**UM9162:** "Damn big fat boy too nigga."

**MIRAMONTES:** "You knew that....this not 580-this not 580 yet, this not 580"

**UM9162:** "Is it the 580? 580 on the way."

**MIRAMONTES:** "580 on the way."

**UM9162:** "Ay Bizzle...huh?....Let me call you right back, Let me call you right back [UI]"

**MIRAMONTES:** "We'll see you right there."

**UM9162:** "Alright *unintelligible*"

**MIRAMONTES:** "Southbound, southbound"

**UM9162:** "Be careful driving that block in that nice ass Benz"

**MIRAMONTES:** "I know I already know it....I got insurance on this motha fucka tho."

57. Based on my training and experience, I believe that in this call: Miramontes and UM9162 have changed their meeting location to the area of 10th St and Locust (…Uh you trying to meet me on 10th and Locust?") and (“yeah I can do that”). Physical surveillance was sent to the area however were unable to observe Miramontes or UM9162 and likely did not arrive in time to observe the meeting.

58. At 3:01PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Miramontes (TARGET TELEPHONE 2) to the **Target Cell Phone**. This call was recorded through the court authorized interception of Miramontes' phone

31

line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **UM9162:** "Make a right and come all the way down, like park next to-by the blue car."
>
> **MIRAMONTES:** "Alright say less."
>
> **Unknown Male in Car**: "We're on 11th right now, we're on 11th right now, we're making a right on 10th."
>
> **MIRAMONTES:** "We hittin the corner right now and shit."
>
> **UM9162:** "I see you."
>
> **MIRAMONTES:** "You don't see me nigga."
>
> **UM9162:** "Nigga I see you what you talkin about nigga."
>
> **MIRAMONTES:** "Love."
>
> **UM9162:** "Love."

59. Based on my training and experience, I believe that in this call: UM9162 is directing Miramontes to 11th Street near Locust Avenue ("We're on 11th right now, we're on 11th right now, we're making a right on 10th."). UM9162 sees that Miramontes has arrived in the area ("I see you.").

60. At 3:12PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court

32

authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "You gotta, I, I just can't do it in here bro. Matter fact. Yeah but you gotta blow it out the window and shit bro. What's that called, uh, what's that called I was gonna say was he, he, he, he only, he only gave me, he only gave me three of them and shit."

**CHS #1:** "Oh did he?"

**MIRAMONTES:** "Yeah he only, he only gave me three and shit bro, it, and, they, they is good and shit bro it's just that, they, they is good and shit it's just that the price is still the same and shit."

**CHS #1:** "So 1650 for the three."

**MIRAMONTES:** "Yeah."

**CHS #1:** "Alright that's fine."

**MIRAMONTES:** "I was trying to get it to four and shit but he, he, he said dude being on some fucking cheap ass shit so."

**CHS #1:** "Um, so I gotta get these kids from school real quick, um"

**MIRAMONTES:** "And then, just let me know when you get them from school and then you just meet me, I'll, I'll shoot to IKEA just let me know then and shit and I'll jump on the freeway."

**CHS #1:** "Alright, so let's say like, uh, let's meet at IKEA at uh 4:15, 4:15 will be good for me."

**MIRAMONTES:** "That's perfect."

**CHS #1:** "Alright I'll hit you up soon."

**MIRAMONTES:** "Alright love bro."

33

61.  Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes only obtained three ounces ("Yeah he only, he only gave me three and shit bro, it, and, they, they is good and shit bro it's just that, they, they is good and shit it's just that the price is still the same and shit.") and the price is $1650 ("So 1650 for the three" and "yeah"). CHS #1 tells Miramontes that they can meet around 4:15PM at the Ikea parking lot ("Alright, so let's say like, uh, let's meet at IKEA at uh 4:15, 4:15 will be good for me.").

62.  At 3:29PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yo."

**CHS #1:** "Bro like (UI) I'll be there at like 4:30 at the latest so"

**MIRAMONTES:** "That, that's fine, I ain't gonna lie, uh, bro about to, bro about to letting a chop go right now for the low nigga."

**CHS #1:** "For real?"

**MIRAMONTES:** "Yes nigga for the lowski nigga."

**CHS #1:** "Damn for real? (UI) What's, what's low?"

**MIRAMONTES:** "(UI) I know he trying dump, I know he trying to dump for under a g."

**CHS #1:** "For real? How, how much?"

**MIRAMONTES:** "Yeah, like 8."

**CHS #1:** "Damn for real (UI)"

34

**MIRAMONTES:** "Yeah"

**CHS #1:** "You got it too?"

**MIRAMONTES:** "Um, he's, he running up in there to go grab it right now and shit."

**CHS #1:** "Oh for real?"

**MIRAMONTES:** "Yeah."

**CHS #1:** "Shit well, uh I'm not, I'm not 100 percent on that but I'll let you know in a little bit."

**MIRAMONTES:** "(UI), you just let me know I, I'll, I'll, if anything bro I'll, I'll grab it and I'll just hold onto that bitch and shit."

**CHS #1:** "Yeah so then which one is it one of the ones you sent me?"

**MIRAMONTES:** "Uh, I'm not sure which one it is and shit, he, he just told me he's like I got something for you and shit he's like (UI) it's a chop and shit (UI) I'll throw it to you for the low I was like how much is the low and he was like shit I'll give it to you for 8, I was like go grab it so he went inside and shit."

**CHS #1:** "Alright well shit send me a picture of it real quick then, and uh, I'll confirm, I'm, I'm not 100 percent on that, but I'll let you know."

**MIRAMONTES:** "Alright well, you know, I'm gonna grab it so that way just in case if you ever do want to have somebody that wanna grab one or anything it will be right there and shit."

**CHS #1:** "Ok bet."

**MIRAMONTES:** "And then it'll be for the same price, it'll be, it'll, I'll just keep it for the same price and shit."

**CHS #1:** "For 800?"

**MIRAMONTES:** (UI)

35

**CHS #1:** "What is it, what is he able to, find out what it is and then call me back."

**MIRAMONTES:** "Alright say less, he said it's a big boy so."

**CHS #1:** "Alright bet, let me know."

**MIRAMONTES:** "Alright say less, love bro."

**CHS #1:** "Alright love bro."

63. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes has access to a firearm ( "That, that's fine, I ain't gonna lie, uh, bro about to, bro about to letting a chop go right now for the low nigga.") for a low price ("(UI) I know he trying dump, I know he trying to dump for under a g.").

64. At 4:13PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yo I'm jumping on... the freeway now."

**CHS #1:** "Alright, well just give me a little bit long, like, I'm, I'm probably gonna be like 5 minutes later than you maybe 10 so."

**MIRAMONTES:** "That's fine."

**CHS #1:** "Alright, (UI) just pull in the middle then again or whatever so I can find you."

**MIRAMONTES:** "Alright say less, love."

**CHS #1:** "Alright love."

36

65. Based on my training and experience, I believe that in this call: CHS #1 and Miramontes are confirming their meeting time and estimated time of arrival ("Yo I'm jumping on... the freeway now." and "Alright, well just give me a little bit long, like, I'm, I'm probably gonna be like 5 minutes later than you maybe 10 so.")

66. At 4:40PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yo. Alright just uh, when you pull in just be careful like, uh, you'll see the boys straight ahead but they not in our parking lot, they like around the corner."

**CHS #1:** "Oh ok, what they doing?"

**MIRAMONTES:** "They just parked doing something, they, they, they doing something else and shit they not worried about us and shit."

**CHS #1:** "Ok bet, bet, bet, alright uh, you'll see me I'm coming down the frontage road right now so"

**MIRAMONTES:** "Alright."

**CHS #1:** "Alright bet."

**MIRAMONTES:** "Alright love."

**CHS #1:** "Hey you didn't bring that with you did you?"

**MIRAMONTES:** "Uh nah, the chop, bro that, I ain't gonna lie bro that nigga had a fucking, it wasn't even, it wasn't even a chop bro."

37

**CHS #1:** "What was it, a fucking"

**MIRAMONTES:** "It was a fucking big ass fucking sniper rifle and shit."

**CHS #1:** "(UI) sell you the fucking, what the fuck"

**MIRAMONTES:** "Nah it was, it was a, It was literally a huge fucking sniper rifle nigga it was like a fucking, it, it was a big ass one, it was an expensive one though, it was like, it was a 50 caliber."

**CHS #1:** "Damn for real?"

**MIRAMONTES:** "Yeah it was a 50 caliber sniper rifle."

**CHS #1:** (UI)

**MIRAMONTES:** "Big as a bitch though, it was big as fuck bro."

**CHS #1:** "800 dollars for that?"

**MIRAMONTES:** "Yeah he wanted 800."

**CHS #1:** "Holy shit, taxing."

**MIRAMONTES:** "It was an automatic."

**CHS #1:** "He might as well go hunting with the mother fucker, in fucking Africa."

**MIRAMONTES:** "It was an automatic, it was an automatic snipe."

**CHS #1:** "Oh for real?"

**MIRAMONTES:** "Yeah it was an automatic snipe."

**CHS #1:** "Damn, 50 cal too?"

**MIRAMONTES:** "It was a 50 caliber, it was big as a bitch."

**CHS #1:** "Damn, shit, yeah, like 800 dollars ain't"

**MIRAMONTES:** "(UI) What the fuck I'm gonna do with that shit?"

**CHS #1:** "Shit, besides go try to shoot an elephant"

38

**MIRAMONTES:** "Right, like no I'm good, I was like you can keep that motherfucker he was like come on bro just give me, he's like just give me like 700 I'm like no, I wouldn't even give you 500 for that."

67.     Based on my training and experience, I believe that in this call: CHS #1 is inquiring if Miramontes was bringing a firearm ("Hey you didn't bring that with you did you?") and Miramontes says that he did not ("Nah it was, it was a, It was literally a huge fucking sniper rifle nigga it was like a fucking, it, it was a big ass one, it was an expensive one though, it was like, it was a 50 caliber.") Miramontes also warns CHS #1 that the police are in a nearby parking lot and to be careful ("Yo. Alright just uh, when you pull in just be careful like, uh, you'll see the boys straight ahead but they not in our parking lot, they like around the corner.").

68.     At approximately 4:35PM, TFO Zinnen met with CHS #1 at a predetermined location, searched CHS #1 and CHS #1's vehicle and found no weapons, drugs, or money. TFO Zinnen provided CHS #1 with $2650 in recorded buy money, $1650 for the crystal methamphetamine and an additional $1000 to purchase a firearm if Miramontes brought a firearm to the drug transaction. TFO Zinnen outfitted CHS #1 with recording devices and followed CHS #1 to the buy location. From the time that CHS #1 was searched by TFO Zinnen until the time that Miramontes entered CHS #1's vehicle, CHS #1 was kept under constant visual surveillance and did not make any stops or meet with anyone other than Miramontes prior to the actual controlled buy. TFO Seeger observed Miramontes arrive in Apkarian's black Mercedes (AZE 6977) in the Ikea parking lot at 4:25PM. After CHS #1 arrived at 4:52PM, TFO Seeger observed Miramontes exit the Mercedes and enter CHS #1's vehicle and then exit CHS #1's vehicle approximately 2 minutes later. TFO Zinnen later met with CHS #1 who provided TFO Zinnen with the $1000 in surplus money and two bags of suspected crystal methamphetamine. CHS #1 and CHS #1's vehicle were searched and no drugs, weapons, or contraband were located.

39

69.     Case agents reviewed the audio/video recording made by CHS #1 of the transaction and found it to be consistent with CHS #1's account of the transaction.  The drug transaction and money exchange were clearly captured on the video, which showed Miramontes hand the crystal methamphetamine to CHS #1, who, in turn, provided Miramontes with the $1650 in buy money.  Case agents later field tested and weighed the crystal methamphetamine and found the total weight to be 85.7 grams.  A Nark II test kit revealed a presumptive positive reaction for the presence of methamphetamine.  Miramontes was unable to supply a firearm and CHS #1 returned the surplus money to case agents.

70.     I reviewed the pen register/trap and trace records for TARGET TELEPHONE 2 (Miramontes) and found that after this connected call with 414-340-9162 (**Target Cell Phone**), Miramontes made no further attempts to contact 414-242-9011.  I reviewed the pen register/trap and trace records for 414-242-9011 and found the number was disconnected from the network on May 28, 2025, at 7:39PM and made no connected calls after that time.  I also have listened to recorded calls to and from 414-242-9011 and the **Target Cell Phone** and recognize the voice of the user of 414-242-9011 and believe it to be the same person using the **Target Cell Phone**.  I also conducted an analysis of the contacts of both devices and found 15 common contacts, further corroborating my belief that the same individual used both telephone numbers and is now using the **Target Cell Phone**.    Finally,  I reviewed subpoenaed records for 414-242-9011 and the **Target Cell Phone** (414-340-9162) and observed that the IMEI (number 352938142179626) is the same for both phone numbers. IMEI stands for International Mobile Equipment Identity and is a 15-digit number unique to each device.  Thus, I believe based on my training and experience, that the user of 414-242-9011 discontinued use of that number on May 28, 2025, but kept his physical cellular device.  He then established a new telephone number (414-340-9162) and, as of

40

May 30, 2025, is using that telephone number on the same device bearing IMEI number 352938142179626 that he previously used for 414-242-9011. This further confirms my belief that the user of 414-242-9011 and the **Target Cell Phone** are the same individual.

71. Based on my training and experience, the overall investigation, this pattern of phone contacts, and the circumstances of the controlled buy, I believe that Miramontes is obtaining the crystal methamphetamine from the user of 414-340-9162 (**Target Cell Phone**), who is the same individual previously using 414-242-9011.

72. On May 30, 2025, the Honorable Nancy Joseph signed an order for pen register/trap and trace (PRTT) data for the **Target Cell Phone**.

73. I believe that the historical location data requested for the **Target Cell Phone** will assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys. I believe that the call detail records requested will help identify other DTO members and potential sources of supply. I believe that the requested prospective location data will assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers including UM9162, stash locations, and meeting locations.

74. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of

41

the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

### Cell-Site Data

75. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

76. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

### E-911 Phase II / GPS Location Data

77. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-

longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

78. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication

43

without revealing the communication's content. Currently, the **Target Cell Phone** has an IMEI of 352938142179626

<u>**Subscriber Information**</u>

79.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone' user or users and may assist in the identification of co-conspirators and/or victims.

80.     I have a general understanding of how the cellular telephone network operates. I am aware that cell sites (towers) are strategically placed by cellular service providers, to provide a seamless operation so people can travel virtually anywhere and make or receive an uninterrupted call, send or receive text messages, or initiate a data session via their cellular phone. Usually, cell sites will be mounted high on a large pole, building, or other structure which provides line of sight with the population below. Cell sites are typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the people in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic

44

factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

81. I am aware when a person either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business. The usage event records, commonly referred to as call detail records, stored by their respective cell phone company, mostly contain the following information with some exceptions based on the specific carrier: Date, time, type of event, duration, phone number initiating the usage event (called, calling), even if caller identification is blocked by the calling party, text message transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

82. I believe such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

83.     I am aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

84.     I know that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving these records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records which would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, they could also assist in proving one's innocence.

85.     I am aware cellular service providers maintain specialized location records consisting of engineering data. These data sets are used by the providers to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures). These records not only include the basic call detail records, but also an estimation of the target phones location (Latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phones location and could place a target phone within close proximity of a crime scene before, during and after a crime. Each carrier uses

46

their own nomenclature to describe the technology used to obtain this data including: NELOS (Network Event Location System) – T-MOBILE, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon &amp U.S. Cellular, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TDOA (Time Difference of Arrival) or Timing Advance Information – T-Mobile & Metro by T-Mobile.  I believe this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases.  Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

86.     I am seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In my training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

87.     In my training and experience individuals often use digital devices and cellular devices to post messages to others on social networking applications. In my training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS and MMS technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, I seek to search all the communication evidence maintained by the service provider.

88.     I am also seeking evidence of association. I know that establishing the association of co-conspirators is important in proving a concert of action between multiple persons. In my training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In my training

47

and experience, associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore I am seeking the call detail record evidence to demonstrate the associations of the individuals in this case. Because this evidence is intended to be used to show associations of the user/owner of the device and co-participants, I am seeking the above items regardless of the dates the information was created.

89. I am aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets. I believe this information is relevant and material to the matter at hand as the contents of the remote digital storage may contain information presently unavailable to investigators including: associated identifying information from the user's contacts which would tend to identify possible suspect's, witnesses, associates, and/or co-conspirators, the content of messages sent between those parties, digital images and videos which may contain evidence of the crime under investigation, and documents related to same.

90. I am aware cellular service providers maintain a master cell site list of all cell sites within their network. These cell site lists will include the specific switch, cell site number, name,

48

physical address, latitude and longitude of the cell site, all sectors associated with each cell site, azimuth, and beam-width of each related sector. When reviewing call detail and specialized location records from the carriers, the records may only reference a specific switch, cell and sector, or LAC and CID/eNodeB ID, related to each usage event; they usually will not include the location (latitude and longitude) of the actual cell site and azimuth of the sector. It becomes necessary to reference a cell site list in order to plot the exact location of the cell site and to identify the azimuth of the sector used associated with specific usage events.

91.     Also, in the course of the investigation and review of the call detail and specialized location records, it may become necessary to visualize all cell sites within a geographic region of interest, not just the cell sites used by the target phone. It is just as important to show cell sites not used by a target phone, as it is to show cell sites used. By obtaining the master cell site lists from the cellular service providers, investigators are able to plot all of the cell sites in a given region, helping investigators with disproving of alibis, statements, and other observations evidenced by the records.

92.     I am seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. I am aware, depending on whether the account is post-paid or pre-paid, a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement. The information required by most cellular service providers include the customer's personal identifying information, verified using

49

government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes. I believe this information is relevant and material to the matter at hand as it serves multiple purposes including: identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. I know that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In my training and experience some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

93. I am aware of the ease of being able to purchase a pre-paid cellular phone, and how it has impacted law enforcement's effort when attempting to identify criminals and locate wanted felons. It becomes very difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, I know of many cases where pre-paid phones were used by suspects to further facilitate their criminal behavior, with the intent of concealing their true identity. Despite the lack of personally identifiable information, prepaid accounts can still provide investigators with information to identify the user. By examining the

50

call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

## AUTHORIZATION REQUEST

94.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

95.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

96.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

51

97.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

98.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

## ATTACHMENT A

### Property to Be Searched

1.  Records and information associated with the cellular device assigned **call number 414-340-9162**, with International Mobile Equipment Identity number 352938142179626 (referred to herein and in Attachment B as "the Target Cell Phone"), with listed subscriber(s) "No Name" that is in the custody or control of  Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2.  The Target Cell Phone

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period **May 1, 2025 to the present**:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records**[. OR**; and**]**

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

Honorable Nancy Joseph, United States Magistrate Judge, has also issued an order pursuant to 18 U.S.C. § 3123, dated May 30, 2025, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively

and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.  Information to be Seized by the Government

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Christopher Badgett, Jaime Rosado, the unknown user of the Target Cell Phone, and other persons known and unknown during the period of **May 1, 2025 to the present**:

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon Wireless,and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon Wireless**.** The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon Wireless and they were made by Verizon Wireless as a regular practice; and

b. such records were generated by Verizon Wireless electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon Wireless in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Verizon Wireless and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____  _____
Date                      Signature

Case 2:25-mj-00070-WED    Filed 06/04/25    Page 69 of 75    Document 1

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original

CLERK'S OFFICE
A TRUE COPY
Jun 04, 2025
s/ K. Reed
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Records and information including location information
associated with the cellular device assigned call number
414-340-9162 ( "Target Cell Phone" ), that is in the custody or
control of Verizon Wireless, further described in Attachment A

)
)
)
)
)
)
)
)

Case No.    25    MJ    70

Matter No 2025R00094

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before    06/18/2025    *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Hon. William E. Duffin    .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for 30    days *(not to exceed 30)*    ☐until, the facts justifying, the later specific date of _____ .

Date and time issued:    06/04/2025 at 10:15 a.m.

*Judge's signature*

City and state:    Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_Executing officer's signature_

_Printed name and title_

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned **call number 414-340-9162**, with International Mobile Equipment Identity number 352938142179626 (referred to herein and in Attachment B as "the Target Cell Phone"), with listed subscriber(s) "No Name" that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2. The Target Cell Phone

53

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period **May 1, 2025 to the present**:

  i.   Names (including subscriber names, user names, and screen names);

  ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii. Local and long distance telephone connection records;

  iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

  v.   Length of service (including start date) and types of service utilized;

  vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

  vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

  viii. Means and source of payment for such service (including any credit card or bank account number) and billing records**[. OR**; and**]**

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

Honorable Nancy Joseph, United States Magistrate Judge, has also issued an order pursuant to 18 U.S.C. § 3123, dated May 30, 2025, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively

3

and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Christopher Badgett, Jaime Rosado, the unknown user of the Target Cell Phone, and other persons known and unknown during the period of **May 1, 2025 to the present**:

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4